**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **INDICTMENT NO. 4:21-CR-0111** |
| | ) | |
| **RAPHAEL SAMUEL SMITH, et. al.** | ) | |
| **Defendant.** | ) | |

## DEFENDANTS'S FIRST PARTICULARIZED MOTION TO SUPPRESS WIRETAP

COMES NOW, Defendant Raphael S. Smith, (hereafter "Smith") by and through counsel, and pursuant to the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution; 18 U.S.C. §§ 2234, 2510, 2515 and 2518(10)(a), 2703 et seq.; and moves this Court for an evidentiary hearing, and an order suppress (1) any and all evidence obtained through intercepted wire or oral communications, and (2) any and all evidence obtained through orders for release of telephone records, including subscriber information, cell site location information, and call detail records for the telephones.

As grounds in support, Smith alleges that the wiretap and/or electronic interceptions, GPS and/or cell site location of his telephones, and the seizure of all telephone records and subscriber information, were improper, illegal, and without probable cause, in violation of his rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, and the statutory provisions contained in 18 U.S.C. §2234, 18 U.S.C. §2510, 18 U.S.C. §2703 et seq., in the following particulars:

1

## I. <u>MOTION TO SUPPRESS INTERCEPTED COMMUNICATIONS</u>

### A. <u>Facts</u>

1. Movant's communications were first intercepted[1] based on the "Sealed Court Order" dated June 10th, 2020 and signed by Hon. Louisa Abbot, Judge, Superior Court of Chatham County, and referenced as "Target Telephone -15 and/or TT-15". The Affidavit alleges Japheth Charles Orr used telephone number (912) 596-3416 to facilitate narcotics distribution with monitoring ending on July 13th, 2020.

2. Movant's communications were further intercepted based on the "Sealed Order" dated June 24th, 2020 and signed by Hon. Louisa Abbot, Judge, Superior Court of Chatham County, and referenced as "Target Telephone -17 and/or TT-17". The Affidavit alleged Adam Mathias Garcia used telephone number (567) 204-9520 to facilitate narcotics distribution with monitoring ending on August 3rd, 2020..

### B. <u>Standing</u>

Movant has standing to contest the legality of any and all interceptions of his wire/oral communications in that Movant is an "aggrieved" person pursuant to 18 U.S.C. §2510 *et seq.,* particularly 18 U.S.C. §2510(11); to-wit: he and his phone were intercepted on or around June 10th, 2020 through at least August 12th, 2020, he was a party to intercepted communications with Japheth Orr and Adam Garcia, the

---

[1] The initial wiretap was based on the "Sealed Investigation Warrant" dated February 10th, 2020 and signed by Hon. Louisa Abbot, Judge, Superior Court of Chatham County, and referenced as "Target Telephone -1 and/or TT-1" though Smith wasn't known or intercepted at the time.

communications were unlawfully intercepted, and the interceptions were not made in conformity with the order of authorization or approval.  H.Rep. No.1549, 91st Cong. 2nd Sess., _United States v. Tucker,_ 526 F.2d 229, 282 & n. 4 (5th Cir. 1976) (a cognizable "claim" need be no more than a "mere assertion" provided that it is a positive statement that interception was illegal); _United States v. Pacella,_ 622 F.2d 640 (2d Cir. 1980); _United States v. Williams,_ 580 F.2d 578 (D.C. Cir. 1978).

Discovery indicates that during the interception period, Smith's communications were intercepted on the following telephones:

- **(912) 272-4783 and the phone numbers listed in part A.**

Therefore, because Movant's communications were intercepted, he has standing to challenge the above-referenced wiretap.

### C. Statutory Framework and Requirements of Interception of Private Communications

The fundamental framework behind federal wiretapping statutes is the protection of privacy rights of citizens from unwarranted invasions by government (or private) intrusions. To protect that "fundamental" right, the federal government erected statutory barriers to the interception of presumptively private conversations.

To that end, in 1968 Congress passed Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (18 U.S.C. §§2510-2521) to conform to the constitutional standards governing wiretaps prescribed by the Supreme Court in _Berger v. New York,_ 388 U.S. 41(1967), and _Katz v. United States,_ 389 U.S. 347 (1967). That Act, as amended, requires (at a minimum) the following:  a full and complete statement of the alleged offense, the facilities where the communications are to be intercepted, a particular description of the communications sought to be intercepted, the identity of the persons

committing the offense and of persons whose communications are to be intercepted, a full and complete statement of whether or not other investigative procedures have been tried and failed or why they appear unlikely to succeed or are too dangerous, and a full and complete statement of the period of time for which the interception is to be maintained. *See, e.g.* 1*8 U.S.C. §2518(1)(b)* and *(3)(c)*, <u>United States v. Kahn</u>, 415 U.S. 143, 153 n. 12(1974); <u>United States v. Giordano</u>, 416 U.S. 505 (1974).  Additionally, any application must include information concerning previous applications involving any of the same persons, facilities, or places. 18 U.S.C. §2518(1)(e).

If presented with an appropriate application, a court may actually issue a surveillance order for interception of private communications only if it finds probable cause[2] to believe that (1) a person is committing one of the crimes enumerated in Section 2516 of Title III, (2) communications concerning such an offense will be obtained through interception, (3) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous, and (4) the facilities from which the communications which are to be intercepted are being used in connection with the commission of the offense. 18 U.S.C. §2518(3)(a), (b), (c) and (d).[3]

If the above is met, a court may issue an order which specifies the identity of the person whose communications are to be intercepted, 18 U.S.C. §2518(4)(a), and the nature and location of the communications facilities or the place where the interception will occur. 18 U.S.C. §2518(4)(b). The order must also specify the type of

---

[2]   The probable cause standard is the same as that used in ordinary search warrants. *See,* <u>United States v. Green</u>, 40 F.3d 1167 (11th Cir. 1994); <u>United States v. Wagner</u>, 989 F.2d 69, 71 (2nd Cir. 1993).

[3]   Of course, the court must find that investigative techniques have failed.

communication to be intercepted, the particular crime to which it relates, and length of authorized interception. 18 U.S.C. §2518(4)(c) and (e).

The order itself must be executed "as soon as practicable" and "terminate upon attainment of the authorized objective." 18 U.S.C. §2518(5).  Periodic progress reports may also be required by order of the court.  *See,* 18 U.S.C. §2518(6); *United States v. Van Horn,* 789 F.2d 1492, 1499 (11th Cir. 1986).

Post-authorization duties attendant to the execution of an interception warrant includes, *inter alia,* minimization,[4] and timely sealing.[5]

Finally, Title III must be strictly construed in favor of privacy interests because Congress intended Title III's procedural controls to be a "pre-condition to the acceptability of any wiretapping at all."

Title III also contains a "necessity" requirement, separate and distinct from any probable cause requirement that must be satisfied before a wiretap order may be lawfully issued. *18 U.S.C. §§2518(1)(c) and 2518(3)(c)*. The purpose of the necessity requirement is "to ensure that the relatively intrusive device of wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Edwards,* 69 F.3d 419,429 (10th Cir. 1995*); quoting United States v. Kahn,* 415 U.S. 143,153 n.12 (1974). Thus, before issuing a wiretap order, a court must independently determine that the requested wiretap is necessary. *See, e.g., United States v. Mondragon,* 52 F.3d 291, 293 (10th Cir. 1995).

---

[4]   18 U.S.C. §2518(5); *United States v. Moody,* 977 F.2d 1425 (11th Cir. 1992); *Gonzalez v. State*, 175 Ga. App. 217, 333 S.E.2d 132 (1985).
[5]   18 U.S.C. §2518(8)(a) and (b); *United States v. Matthews,* 431 F.3d 1296 (11th Cir. 2005); *United States v. Ojeda Rios,* 495 U.S. 257 (1990)

To meet this burden, "generalities, or statements in the conclusory language of the statute, are insufficient to support a wiretap application". *United States v. Castillo-Garcia,* 117 F.3d 1179, 1188 (l0th Cir. 1997).  In *United States v. Blackmon*, 273 F.3d 1204 (9th Cir. 2001), the Court held that a wiretap application is insufficient where it contains "only general allegations that would be true in most narcotics investigations . . . [and] boilerplate conclusions that merely describe inherent limitations of normal investigative procedures." *Id.* at 1210.

In fact, "[T]he statements must be factual in nature, and they must specifically relate to the individuals targeted by the wiretap." *Id.; See also, United States v. Smith,* 31 F.3d 1294 (4th Cir. 1994); *United States v. Ashley,* 876 F.2d 1069, 1072 (1st Cir. 1989) ("bare conclusory statements"); *United States v. Leavis,* 853 F.2d 215 (4th Cir. 1988); *United States v. McKinney,* 785 F.Supp. 1214 (D. Md. 1992); *United States v. Ippolito,* 774 F.2d 1482 (9th Cir. 1985); *United States v. Robinson,* 698 F.2d 448 (D.C. Cir. 1983); *United States v. Kalustian,* 529 F.2d 585 (9th Cir. 1976).

Similarly, the adoption of the exact language from prior applications fails to satisfy the congressional intent that the Government must show with specificity in each application why it will fail in lieu of a wiretap order. *See Castillo-Garcia, supra; see also, United States v. Simpson,* 813 F.2d 1462, 1471-1472 (9th Cir. 1987); *United States v. Carneiro*, 861 F.2d 1171, 1176 (9th Cir. 1988).

That is, identity between applications indicates that the Government "never paused to give further renewed consideration of...normal investigative procedures...and it never really tried to use any of these procedures… (and the government) proceeded from one wiretap to another." *United States v. Castillo-Garcia,* 920 F.Supp. 1537. 1543 (D.Colo.

1996) *aff'd* 117 F.3d 1179 (10th Cir. 1997).

Thus, in order to obtain an electronic surveillance order, the Government must move beyond "bare conclusory statements," *Ashley, supra,* or "mere boilerplate recitations," *Leavis, supra,* to explain fully... with particularity", *Castillo- Garcia, supra,* why specific techniques would either be unsuccessful or too dangerous.

Further, an extension application must contain "a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results." 18 U.S.C. § 2518(1)(f).  Otherwise, failure to do so invalidates the evidence and results of the extension or second order. *See People v. Bockman*, 328 Ill. App. 3d 384, 767 N.E.2d 832, 836 (2d Dist. 2002); *United States v. Dorfman*, 542 F.Supp. 345 (N.D. Ill. 1982), *judgment aff'd*, 737 F.2d 594, 15 Fed.R. Evid. Serv. 1296 (7th Cir. 1984).

Regarding minimization, *18 U.S.C. § 2518(5)* requires each initial and extension order to include a minimization requirement. *See Scott v. United States,* 436 U.S. 128 (1978). Minimization embodies the constitutional requirement of avoiding, to the greatest possible extent, seizure of conversations which have no relationship to the crimes being investigated and limiting the scope of any invasion of privacy by the Government. *See Berger v. New York,* 388 U.S. 41 (1967). To accomplish minimization, the most effective form of supervision is judicial review of the progress. *See United States v. Quintana,* 508 F.2d 867 (7th Cir. 1975); Section 2518(6). Courts have also approved a "two-minute" rule, *see, e.g. United States v. Moody,* 762 F.Supp. 1491, 1497 (N.D. Ga. 1991), to

determine the pertinence of the conversation.[6]

Moreover, in _United States v. Gonzalez, Inc.,_ 412 F.3d 1102, 1115 (9th Cir. 2005),

amended on denial of reh'g, 437 F.3d 854 (9th Cir. 2006), the Ninth Circuit has stated:

> The government is not free to transfer a statutory showing of necessity from
> one application to another – even within the same investigation. This court
> has held that _an issuing judge may not examine various wiretap_
> _applications together_ when deciding whether a new application meets the
> statutory necessity requirement. Each wiretap application must separately
> satisfy the necessity requirement. (Emphasis added). _Id._

In _United States v. Santora_, 583 F.2d 453 (9th Cir. 1978), _judgment vacated_, 441

U.S. 939, 99 S.Ct. 2155 (1979), the second-generation application involved five new

telephones belonging to five individuals not named in the first-generation application, but

whose identity and involvement in the conspiracy was uncovered during the initial

wiretap. _Id._ While the second-generation application incorporated by reference the first-

generation order, the new application "failed to recite that any specific efforts had been

made…to investigate the activities of those persons whose telephones were to be tapped

to discover each of those individuals' complicity" in the activity under investigation. _Id._

at 466-467; _See also United States v. Blackmon_, 273 F.3d 1204 (9th Cir. 2001)

(boilerplate or general statements regarding alternative investigative procedures for the

subsequent wiretap applications held insufficient).

Thus, for every wiretap application for a new telephone, law enforcement must make

a specific showing that normal investigative techniques investigating the individual

sought to be intercepted have been tried and failed or would not suffice. _Id.; See United_

_States v. Castillo-Garcia_, 117 F.3d 1179, 1187-88 (10th Cir. 1997) (overruled on other

---

[6]   Although after surveillance has been underway for some period, two minutes for determining
pertinence is too long. _See United States v. Parks,_ 1997 WL 136761, at 18 (N.D.Ill. 1997).

grounds by, _United States v. Ramirez-Encarnacion_, 291 F.3d 1219 (10th Cir. 2002)).

Further, if intercepted communications are in code or a foreign language, and an expert in that foreign language or code is not present during the interception period, minimization may be accomplished as soon as practicable after such interception. _18 U.S.C. §2518(5)_. Thus, if foreign language expert monitors were not available during the interception period, the Government has the burden of showing that the government made immediate reasonable efforts to have such monitors available during the interception period, and that despite these reasonable efforts, the monitors were unavailable, and, that after-the-fact minimization by these monitors was accomplished as soon as practicable and in a reasonable manner. _United States v. Padilla-Pena_, 129 F.3d 457, 463 (8th 1997) (after-the-fact minimization allowed because government believed pertinent calls would be in English and had not procured Spanish speaking monitors before activating wiretap, thus, Spanish monitors were not "readily available" at inception of the wiretap; also, government obtained translators as soon as possible after-the-fact, and, within two weeks had full-time monitors who could translate and conduct immediate minimization); _See United States v. Castillo Garcia_, 920 F.Supp. 1537, 1552 (1996) (government showed Spanish monitor utilized and present during all intercepted communications).

Because Movant contends that insufficient minimization procedures were utilized _sub judice,_ the burden is on the Government to show proper minimization. _United States v. Torres,_ 908 F.2d 1417 (9th Cir. 1990); _United States v. Armocida,_ 515 F.2d 29 (3rd Cir. 1975); _United States v. Rizzo,_ 491 F.2d 215, 217, n.7 (2nd Cir. 1974).

To fully litigate this issue, Movant requests a hearing at which the Government

must bear the burden of proof as to, *inter alia:*

    a.  The number and identification of intercepted conversations which were "coded" and the efforts and techniques utilized to "decode" such conversations either at the time or after the conversation;

    b.  How soon after the termination of any conversation the minimization occurred; and

    c.  Who accomplished the minimization and whether they were an expert in code language, if necessary.

## D.  Grounds for Suppression of Wiretaps

Movant, pursuant to 18 U.S.C. §§2515 and 2518(10)(a) and the Fourth Amendment to the United States Constitution, requests the Court to suppress the contents of any wire or oral communication intercepted pursuant to court orders described below and any evidence derived therefrom on the grounds that:

    a. The communications were unlawfully intercepted;

    b. The orders of authorization were insufficient on their face;

    c. The applications and court orders were obtained in violation of 18 U.S.C. §§2515 and 2518;

    d. The interceptions were not made in conformity with the court orders or with the requisites of 18 U.S.C. §2518(5); and

Movant requests a hearing on the above issues and alleges the following grounds in support of this motion and reserves the right to supplement this motion upon receipt of any additional discovery reflecting on the matters herein.

### E.  **The Illegal Wiretap Orders**

Law enforcement obtained orders authorizing the interception of wire communications for Japheth Charles Orr, (912-596-3416), TT-15, and Adam Mathias Garcia, (567-204-9520), TT-17. Smith was not named as a target interceptee, but his communications were intercepted on the wiretaps TT-15 and TT-17 and its' extension on July 20th, 2020. As a result of the intercepted communications, law enforcement seized and/or obtained certain evidence that is the fruit derived from the interceptions. Furthermore, Movant believes that the Government is likely to introduce said interceptions against him at trial. Because the wiretaps were illegal as stated herein, all intercepted communications with statements by Smith should be suppressed from evidence at trial. Furthermore, all evidence seized and/or obtained from the illegal interceptions should be suppressed from evidence at trial.

### 1. **Probable Cause - The communications were unlawfully intercepted.**

The information forming the purported basis of probable cause was derived from the initial illegal wiretaps which were not supported by probable cause and did not meet the other requirements of Title III as described herein. Thus, the applications and affidavits for Japheth Charles Orr, 912-596-3416, TT-15, Adam Mathias Garcia, 567-204-9520, TT-17, and all previous wiretaps failed to provide probable cause for the issuance of the orders authorizing the wiretap interception.

### a. **Background**

The basis for this entire investigation began in 2016 when a Confidential Informant #14-47 (CI #14-47), a convicted felon with pending prosecutions, gave a series of interviews that described an alleged Drug Trafficking Organization (DTO) operating out

of the Liberty City neighborhood of Savannah. At the time, CI #14-47 accused several individuals including Harold "Hal" Jenkins and Eric "Boss" Brown of obtaining amounts of cocaine measured in the kilograms for distribution in Savannah.

Later, in 2017, Agent Minton recounts that he participated in another T-III investigation with the CNT that focused on Omar Griffin and Herman Williams who were connected to Hal Jenkins. Unfortunately for the CNT, they were not able to obtain any convictions of Jenkins.[7]

In 2018, Agent Minton was again involved in an investigation utilizing a T-III wiretap with the CNT. During this investigation, the CNT first began its focus on an alleged narcotics distribution ring operating out of the 1900 block of Quincy St. in the Liberty City neighborhood of Savannah. Despite having the facilities of a T-III wiretap at their disposal, the CNT were not able to identify and dismantle this alleged Drug Trafficking Organization (DTO).

In April of 2019, however, Agent Minton participated in an operation by the Strategic Investigations Unit of the Savannah Police Department which relied on an informant with a pending criminal charge for possession of heroin, Dacorry Fulcher. With the approval of the District Attorney's Office, to set up controlled buys of narcotics from a subject, Ralphael Williams. The Unit, further questioned him regarding his knowledge of a narcotics distribution network in Liberty City, specifically the 1900 block of Quincy St.

Fulcher gave the CNT more information about Eric Brown alleged to be the main supplier of narcotics in Liberty City, and another subject, Vernest Cleveland, alleged to be a ranking member of the DTO. Agent Minton employed investigative techniques such

---

[7] The failure of a prior investigation in no way justifies the current investigation.

as law enforcement database searches, subpoenaed records, interviews, search warrants, and wiretaps from the previous investigation to move the investigation forward. Fulcher gave them phone numbers for Williams and another subject named Byron Sanders, who was a target in the previous TIII investigation for which they could never build a successful case.

Around this time, at least by May of 2020, the CNT were utilizing a pole camera located on the 1900 block of Quincy St. that's been used throughout this entire investigation. It was through this pole camera that the CNT was able to connect Cleveland directly with Brown, who maintains a residence at 1927 Quincy Street in Savannah.

Also around this time the CNT began to focus on a subject, Marquis Thomas, who was alleged to be connected with Williams. CNT agents used physical surveillance and controlled narcotics buys in their investigation of Thomas. On October 9th, 2019, the CNT through Agent Minton went to Judge Louisa Abbot of the Superior Court of Chatham County and obtained a Pen Register Trap and Trace (PRTT) and Search Warrant (hereafter "**DS1**") for stored electronic data for Marquis Thomas for his cellphone number (912)441-9375. Agent Minton asserted that PRTT, which would include GPS/Cell Site Location tracking data, combing with other investigative techniques such as physical surveillance would help them separate the criminal behavior from the lawful behaviors of the subject and identify who else was participating in this network with Thomas and where they were getting their narcotics. Through the fall and late winter of 2019, the CNT would go on to obtain PRTT warrants for Cleveland and Brown as well and renewing the PRTT on Thomas on December 4th, 2019.

By the time of the application for TT-1, Agent Minton was using boilerplate language from previous PRTT affidavits to establish probable cause for TT-1. The boilerplate language in the affidavit and application includes background information on the affiant, the goals of the investigation, information regarding the previously conducted surveillance and interviews regarding the core members of the alleged conspiracy, namely Brown, Cleveland, and Thomas. It also included conduct which occurred years prior to the application beginning in 2016 and a cursory summary of the un-particularized basis for the "facts" the affiant intended to present to the issuing judge. (See Aff. TT-1 pp. 3-36). This information was stale and does not contribute to establishing probable cause of the wiretap of TT-1. Nonetheless, subsequent to the approval of the warrant for TT-1, it was extended on May 13th, 2020 (TT-11), far longer than necessary to achieve the goals that Agent Minton articulated in the original PRTT warrant regarding Thomas's phone number (912)441-9375.

**b. The Wiretap of TT-15**

On June 10th, 2020, Agent Minton submitted a document package DS24, to Judge Abbot regarding the phone number (912)596-3416 belonging to Japheth Orr. The T-III warrant for TT-15 was terminated on July 13th, 2020. It alleges the same boilerplate recitations to support probable cause as all the prior affidavits up through TT-14. Agent Minton justifies the need for a wiretap based on prior investigations of Omar Williams in 2005 and 2011 that failed to yield his conviction until they obtained a T-III wiretap in 2017. (*See* TT-15, p.37). Agent Minton repeated this verbatim in every Affidavit for a T-III warrant subsequent, including T-17. However, the fact that he couldn't get enough

14

information to convict Omar Williams without a wire has nothing to do with this investigation whatsoever.

In the Affidavit, Agent Minton describes a hierarchy of the alleged DTO which had Brown and Jenkins at the top, followed by Cleveland, Badger, and Newton below them as being in charge of lower-level distributors such as Thomas. Nowhere in the entire Affidavit does the name Raphael Smith ever come up. (*See* TT-15, p. 39) Agent Minton says that at that moment in time, he could get search warrants for residences of Brown, Cleveland, Thomas, as well as additional subjects such as William Badger, Eric Newton, and an unindicted individual Levata Cutter. (*See* TT-15, p. 44) If this had occurred, then based on the hierarchy, he could have decapitated the DTO right then. Nonetheless, he alleges that to do so would be a "fatal error" without explaining why it would not achieve the goals of the investigation he repeatedly lays out. (See TT-15, p. 51)

Agent Minton alleges that without wire interception, timing warrants for when large quantities of cocaine are present would have to rely on "sheer luck" when executing search warrants, despite having a wealth of resources including pole cameras, confidential informants, and GPS data through PRTT warrants. Agent Minton further alleges that the CNT would not be able to find additional stash houses used by Thomas without the T-III wiretap because it gives him the ability to get precision location and GPS data, but conveniently failing to mention that he's had access to this information through renewed PRTT's and T-III wiretaps since at least October 19th, 2019. (*See* TT-15, pp. 45-46)

In addition, Agent Minton lists as a reason for not conducting a trash-pull at 122 Elm Circle, Savannah, known to the CNT to be utilized by Antonio Graham for purposes of

the DTO, that "the listed location is in a high crime area which also happens to be a close-knit neighborhood." Agent Minton fails to provide any facts to support this claim, a problem that's recurrent throughout the affidavits submitted to support these warrants. (*See* TT-15, p. 61)

  c. <u>**The Wiretap of T-17**</u>

  The Application and Affidavit contained in DS26 of this investigation was submitted by Agent Minton to Judge Abbot for the phone number (567)204-9520 belonging to Adam Garcia on June 24th, 2020 and was extended on July 20th, 2020 and terminated on August 24th, 2020. It dutifully recited all of the previous stale information and boilerplate language as the previous T-III applications and affidavits in this investigation, all the way back to the first PRTT's in the investigation, DS1 and DS2 (*See* Aff. TT-17, pp. 7-9).

  The Affidavit for TT-17 also described a past application and affidavit for DS9 regarding a phone number used by Levata Cutter, (912)547-5988, TT-4. She shared a past residence with Thomas and Mandrillis Lewis, who was the subject of TT-5 in this investigation for phone number (912)661-1324. (*See* Aff. TT-17, pp. 10). On April 8th, 2020, the T-III for Cutter was terminated due to the diminishment of the volume of calls indicating that she was not considered to be a player in the DTO and thus was a dead end in the investigation. (*See* App. To Terminate (TT-4), p. 2).

  In the same Affidavit, Agent Minton asserts that "prolonged physical surveillance could potentially expose existing agents, alerting GARCIA and his co-conspirators to the existence of this investigation." *(See* TT-17, p. 15) However, in the Affidavit and Application for TT-16, DS26, Agent Minton describes in detail how the CNT believes the Liberty City DTO is already aware of the investigation (*See* TT-16, p. 37).

The CNT used various surveillance assets throughout the investigation including a helicopter that followed a black Chevy Tahoe on June 10th, 2020 that left Brown's residence and drove to Smith's residence. Following their departure from Smith's residence, the vehicle containing Brown and Orr was pulled over at a convenience store but no contraband was found in the vehicle. (*See* TT-17, p. 42).

For the foregoing reasons, the Affidavits and Applications for the warrants in TT-15 and TT-17 fail to establish probable cause and/or the necessity for the T-III warrant for TT-15. Furthermore, the Affidavits for TT-15 and TT-17 were supported by stale and questionably unreliable information. Thus, the subsequent orders for continued interception were not supported by probable cause either. Additionally, because the subsequent wiretaps were invalid as the fruit of the initial illegal wiretap, all evidence obtained as a result should be suppressed from evidence at trial.

Therefore, because the wiretap orders were not supported by probable cause, but rather stale and unreliable and uncorroborated information, all evidence obtained as a result of the wiretaps should be suppressed from evidence at trial.

## 2. Failure to Show Other Investigative Techniques Failed – As an extension of the necessity requirement, law enforcement must show that other investigative techniques have failed or would not suffice.

The applications and orders are insufficient on their face in their failure to provide a sufficient showing that other investigative techniques have failed or why they reasonably appear to be unlikely to succeed if tried as required by 18 USC §2518(1)(c) and 18 USC §2518(3)(c). There is simply *no* normal investigation once the electronic surveillance commences. *United States v. Blackmon*, 273 F.3d 1204, 1209 (C.A. 9th Cir. 2001) (the statement "that the cooperating sources 'only possess limited knowledge concerning the

scope of the criminal enterprise'" is untrue and omits the extent to which the sources could have been used in gathering evidence against Blackmon).

According to the affidavit in TT-1, no attempt was made to use the investigative techniques of physical surveillance, trash pulls, cooperating sources, consensual monitoring, undercover agents, interviews, search warrants, pen registers/telephone records, grand jury subpoenas and immunity, and consensual recordings. The affidavit for TT-1 does describe successful use of a Confidential Informant "CI 15-45" with the target individual of the initial warrant for Marquis Alfonso Thomas, a/k/a "Mark", yet the affiant nonetheless alleges that CI 15-45 was "unable to purchase large enough quantities of cocaine from, or through, Thomas which could provide access beyond Thomas' level" without any further information to support this premise. The affidavit goes on to assert that information from confidential informants, without the wire and electronic interceptions sought by this application, would result in a successful prosecution of all members of this organization…"

### a. Physical Surveillance

As for physical surveillance, the Agent Minton alleged in every Affidavit that physical surveillance is normally not successful. For that reason, it was not employed. In the Applications and Affidavits for TT-15 and TT-17, there is no showing of necessity or that other investigative techniques had been tried and failed.

However, physical surveillance by agents of the CNT as well as pole cameras were employed heavily in the period preceding and through TT-1 and all through the current investigation. Prior to obtaining the PRTT for Brown's phone number on May 10th, 2019, pole cameras observed a meeting of Cleveland with Brown at 1927 Quincy St. (*See*

Aff. DS2, pp. 5-7). Furthermore, it was revealed in this Affidavit that Agent Minton had Brown's address flagged with the USPS Postal Inspector's office for suspicious parcels and that's how they intercepted a package shipped from Davis, California to Ann Brown containing 8.5 lbs. of marijuana. (*Id* at p. 9). Agent Minton also relied on physical surveillance of Thomas's apartment at 8505 Waters Ave. in Savannah early in the investigation to help justify the first PRTT warrant. Agent Minton was able to get Thomas's license plate number to discover the existence of another residence for him. (*See* Aff. PRTT 9375, p. 9)

### b. Administrative Subpoenas, Law Enforcement Datatbases

Early in the investigation, Agent Minton described the CNT's use of investigative subpoenas of subscriber information connected with the phone number of Brown. (*See* Aff. PRTT 0878, p. 19). He studied Brown's call detail records for when calls come and go and noticed that Brown's 2nd top caller was using a number that the law enforcement database (ACCURINT) associated with Cleveland. (*Id*.) These administrative subpoenas and database searches, as well as searches of social media were crucial throughout the investigation (*See* TT-17, p. 33)

### c. Confidential Informants

The use of confidential informants was a successful tool employed by law enforcement from the very beginning of the investigation. The Affidavits for the PRTT warrants as well as TT-1 rely heavily on the use of a CI #15-45 used to make controlled buys from Thomas (See TT-1, pp. 18-22). The Affidavit in TT-15 says that a Confidential Informant was used to target Thomas, but that Agent Minton had

19

determined that he could gain no further access to the alleged DTO. He failed to explain why he believed this to be true. (*See* TT-15, pp. 42, 47).

Thus, it is difficult to believe that these traditional investigative techniques, combined with physical surveillance and search warrants, could be so easily cast aside and labeled "tried and failed" in this case, especially since some of these techniques, in combination or alone, and without the use of wiretaps, were never even attempted.  On the contrary, it is completely conceivable that use of interviews, confidential informants, consensual monitoring, along with pen registers, surveillance, and search warrants, could have led law enforcement to achieve the goals of their investigations.

What the Applications do is conflate the affiant's belief that there is probable cause to believe some suspects are engaged in a criminal conspiracy, with the *particularized necessity* for a wiretap. *The standard is necessity, not investigatory utility*. Wiretaps produce huge returns and valuable evidence for law enforcement. Not surprisingly, in many wiretap requests the State conducts only the most cursory of investigations before resorting to the now-inevitable Title III Application, knowing that Courts routinely grant the Applications.

Because of the strong presumption of privacy, Movant suggests that Title III contains an inherent requirement – that other investigatory procedures be undertaken in "good faith" – and it is the government's burden to prove same. *See United States v. Spagnuolo*, 549 F.2d. 705, 710 (9th Cir. 1997) (normal investigative techniques must be "employed in a *good faith effort*" (emphasis added)); *United States v. Staves*, 383 F.3d 977, 980 (9th Cir. 2004) (necessity to be determined only when "normal investigative techniques, *employed in good faith*" have failed (emphasis added)).

Therefore, the TT-15 and TT-17 applications failed to show that "normal investigative techniques have failed or appear reasonably unlikely to succeed if tried or are too dangerous to be tried." Further, because law enforcement relied on evidence which was the fruit of the illegal wiretaps to obtain any subsequent wiretap, all evidence from the additional wiretaps should be suppressed from evidence at trial as the fruit of the initial illegal wiretap orders.   Moreover, as stated herein, the subsequent application failed to show investigative techniques had been tried and failed, or otherwise state why normal investigative techniques were not attempted.

### 3. Minimization - Upon information and belief, the law enforcement agents failed to comply with the minimization requirement of 18 USC 2518(5).

The burden is on the Government to show proper minimization. *United States v. Torres*, 908 F.2d 1417, 1423 (9th Cir. 1990); *United States v. Rizzo*, 491 F.2d 215, 217, n.7 (2nd Cir.), *cert. denied*, 416 U.S. 990 (1974). The Government's pervasive and substantial failure to minimize non-pertinent calls as a whole in this case allows the inference that the Government engaged in an essentially warrantless general search, warranting the suppression of all intercepted calls. *United States v. Suquet,* 547 F.Supp. 1034, 1037 (N.D. Il 1982); *See United States v. Blackmon*, 273 F.3d 1204 (C.A. 9th Cir. 2001).

### 4. Identity of Persons Whose Communications May be Intercepted - The orders are invalid on their face in that they fail to specify the persons whose communications may be intercepted.  18 USC §2518(4).

This requirement is separate and distinct from the requirements of 2518(1)(b)(iv) (requiring the *application* specify the identity of the persons known to be committing the offense) and 2518(3)(a) (requiring the Judge to find probable cause that an individual is committing a particular offense prior to entering a wiretap order). The orders *sub judice* fail

to specify the identity of the persons whose communications may be intercepted on the targeted phones.

For example, even with the subsequent applications, after individuals were *identified* by law enforcement as target subjects to be intercepted over the target telephones, the applications failed to identify these individuals as persons whose communications could be intercepted.

### 5. **Description of Communication to be intercepted was Insufficient.**

The application and orders are insufficient on their face in their failure to provide a sufficiently particular description of the type of communication sought to be intercepted as required by 18 U.S.C. §2518(1)(b)(ii) and 18 U.S.C. §2518(4)(c).

WHEREFORE, Defendant respectfully requests that this Court grant an evidentiary hearing and suppress the improperly obtained evidence against him in this case.

This 15th day of February 2022.

Respectfully submitted,

/S/ Bruce Harvey
LAW OFFICES OF BRUCE S. HARVEY
ATTORNEYS FOR DEFENDANT
Bruce S. Harvey, #335175
bruce@bharveylawfirm.com
Jamie Roberts, #608590
jamie@bharveylawfirm.com

146 Nassau St.NW
Atlanta, GA 30303
(404) 659-4628 office
(404) 681-3953 fax

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **INDICTMENT NO. 4:21-CR-0111** |
| | ) | |
| **RAPHAEL SAMUEL SMITH, et. al.** | ) | |
| **Defendant.** | ) | |

## CERTIFICATE OF SERVICE

I certify that I served a copy of the foregoing *Defendant's First Particularized Motion To Suppress Wiretap* on opposing counsel by facsimile transmission, electronic delivery, by hand delivery, or by depositing a copy of the same in the United States Mail with sufficient postage thereon, addressed as follows:

Frank Pennington, AUSA
22 Barnard St., Suite 300
Savannah, Georgia 31401

This 15th day of February 2022.

Respectfully submitted,

/S/ Bruce Harvey_____
LAW OFFICES OF BRUCE S. HARVEY
ATTORNEYS FOR DEFENDANT
Bruce S. Harvey, #335175
bruce@bharveylawfirm.com
Jamie Roberts, #608590
jamie@bharveylawfirm.com

146 Nassau St.NW
Atlanta, GA 30303
(404) 659-4628 office
(404) 681-3953 fax

23