# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
### SAVANNAH DIVISION

| | | |
|---|---|---|
| **UNITD STATES OF AMERICA** | ) | |
| | ) | |
| | ) | **CASE NO. 4:21-CR-111** |
| **v.** | ) | |
| | ) | |
| | ) | |
| **RAPHAEL SMITH** | ) | |

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT RAPHAEL SMITH'S MOTION TO SUPPRESS SEARCH WARRANT AND OTHER EVIDENCE (Doc. 341)

**TO THE HONORABLE COURT:**

**COMES NOW** the United States of America, through David H. Estes, United States Attorney for the Southern District of Georgia, and the undersigned Assistant United States Attorney, and before this Honorable Court, responds to Defendant's Motion to Suppress (Doc. 341). For the reasons set forth below, the Government opposes the motion.

## INTRODUCTION

Defendant Raphael Smith (hereinafter "Defendant") alleges in his brief that "the search of his home and the seizure of items from it were improper, illegal, and without probable cause" as well as statements made by Defendant. Doc. 341, p. 1. The Defendant claims:

1. That police conducted a warrantless search of Defendant's "premises;" Id. at 4;

2. That the search warrant lacked probable cause and was based on evidence illegally obtained. Id;

3. That the search warrant was overly-broad and non-particularized; and

4. That Defendant's statement to police was not knowingly and voluntarily made.

For the reasons set forth below, the Defendant's contentions are without merit and thus the Motion to Suppress must be denied.

## STATEMENT OF PERTINTENT FACTS

Beginning as early as April 2019, law enforcement received information regarding individuals associated with a drug trafficking organization operating in the Liberty City area of Chatham County. In August of 2019, law enforcement started to conduct an investigation into this organization and completed four [4] controlled purchases. In February of 2020, law enforcement was granted the first Title III intercept. All told, this investigation included court-authorized wiretaps for 21 lines. The interceptions of wire and electronic communications reveled the individuals listed in this indictment are involved in the DTO drug conspiracy.  This monitoring was done in conjunction with physical surveillance, use of pole camera monitoring, federally authorized GPS tracking devices, cellular GPS tracking, etc.  Additionally, the United States Postal Inspectors Service tracked packages of suspected narcotics originating from outside of the Southern District of Georgia that were shipped to members of the conspiracy.  Agents identified, through the controlled purchases and interceptions of wire and electronic communications, numerous locations used by the

DTO.  Numerous search warrants for cell phone data, tracking devices, and suspected narcotics parcels were also executed as part of the investigation.

On June 10, 2020, CNT Agent Minton and other CNT agents initiated an operation targeting the transport and exchange of a large shipment of cocaine involving members of the DTO, specifically Eric Brown, Japeth Orr, Vernest Cleveland, Antonio Graham, Nolan Smith, William Badger, and Defendant Raphael Smith. Exh. A, p. 1.  During that time, agents were utilizing active wiretaps, along with remote and aerial surveillance to cover meetings relating to the narcotics resupply being conducted by the DTO.  Id.

Utilizing the wire intercepts on June 8, 2020, agents had learned that Brown, Orr, and others made arrangements with a narcotics courier for a large resupply of cocaine. Exh. C, p. 3. It was also learned that the narcotics resupply was to be transported by vehicle into Chatham County on June 10, 2020, where the courier would meet with Brown and Orr.  At approximately 2:00 pm on June 10, 2020, agents observed Orr arrive at Brown's residence, 1927 Quincy Steet, Savannah, Georgia.  A short time later, other coconspirators began to arrive at the residence.  Between that time and 4:59 pm, agents observed the men meeting and observed several apparent exchanges between coconspirators and Brown. Id.  The wire (also known to agents as CRI 14-95) provided agents with interceptions confirming the arrival of coconspirators and established the DTO was in contact with the narcotics courier at that time in preparation for a meeting around 5:00 pm.  Id.; Exh. C, p. 4.

Of particular interest to this Defendant, agents observed him meet with Orr at approximately 3:44 pm.  Exh. A, p. 3.  Prior to the meeting, Orr departed Brown's residence in Brown's black Chevy Tahoe and drove to area of Tuskeegee Street where he parked.  A short time later, CNT agents observed Defendant, in his white GMC Sierra, pull alongside Orr where they witnessed Orr and Defendant make an exchange.   Id. Orr then returned to Brown's residence. Based on CNT agent observations and wire intercepts, Agent Minton and Agent Boger concluded that members of the conspiracy were meeting for the purpose of the impending narcotics resupply.  Id; Exh. C, p. 4.

At approximately 5:12 pm, agents observed Brown depart his residence in the black Chevy Tahoe and travel to Defendant's residence, located at 5611 LaRoche Avenue, Savannah, Georgia (the target residence of the search warrant). Exh. A, p. 3-4. Aerial Surveillance confirmed Brown exited the Tahoe with a black bag in his hand and met with Defendant where an exchange took place.  Id.; Exh. B, p. 1. Surveillance also identified the white GMC driven by Defendant during the earlier exchange at the target location. Id. Following the exchange, Brown left the target location in his Tahoe.

Following the exchange, CNT agents attempted to make contact with Defendant, who was still located in the parking area outside of his residence.  Upon sight of agents, Defendant was observed discarding a black bag and walking away from the white GMC Sierra. Exh. A, p. 4; Exh. B, p. 3-4. Defendant was then detained by agents at approximately 5:46 pm.  Exh. A, p. 4. At the same time, agents detained

Brown and Orr, along with the black Tahoe, nearby.  Brown consented to a search of his vehicle which revealed nothing of value – confirming agents opinion that Brown had given the black bag in his possession to Defendant.  Id. The black bag was determined to contain $54,510.00 separated into banded bundles with rubber bands. Id.; Exh B, p. 4.

Following his detention, Defendant was informed of his Miranda rights and agreed to speak with Agent Minton.  Exh. A, p. 4.  When asked about the bag, Defendant claimed he intended to purchase a conversion van in Miami, Florida with it.  Because there were various buildings and other structures on the property, other agents had taken positions to monitor entry and exit points for officer safety.  One such agent informed Minton that the back door to the residence, which had been closed, now appeared open.  Id.  Although Defendant stated no one else was inside the residence, he did confirm to Agent Minton that there were two firearms inside. Agents then conducted a brief safety sweep of the target location during which drug related items were observed in plain view.  Id.

Later, on June 10, 2020, at approximately 8:40 pm, a search warrant was authorized in the Magistrate Court of Chatham County to search Defendant's residence. Exh. C.

## LEGAL ANALYSIS

### A. Officers contact with Defendant at 5611 LaRoche Ave, Savannah, Georgia was legal.

In his motion, Defendant argues that agents entered his property without a warrant and without exigent circumstances because "they observed no illegal conduct

of Smith's and they had nothing but mere suspicion to suggest that his premises contained any evidence or contraband, much less that someone was in the act of destroying it." Doc 341, p. 4. The Government contends that the agents did not violate the Fourth Amendment by seeking to make contact with Defendant in the front parking area outside his home and that his abandonment of the black bag of money, along with the collective knowledge of officers at that time, justified his detention.

### i. Officers did not require a warrant to make contact with Defendant.

The Fourth Amendment, which prohibits unreasonable searches and seizures by the government, is not implicated by entry upon private land to knock on a citizen's door for legitimate police purposes unconnected with a search of the premises. *Coolidge v. New Hampshire*, 403 U.S. 443, 466, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). *United States v. Tobin*, 923 F.2d 1506, 1511 (11th Cir.1991) (no warrant necessary for officers to approach house to question the occupants). "Absent express orders from the person in possession," an officer may "walk up the steps and knock on the front door of any man's 'castle,' with the honest intent of asking questions of the occupant thereof." *Davis v. United States*, 327 F.2d 301, 303 (9th Cir.1964). Thus, "[o]fficers are allowed to knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants just an any private citizen may." *Estate of Smith v. Marasco*, 318 F.3d 497, 519 (3d Cir.2003). Only where an officer, by means of physical force or a show of authority, has in some way restrained the liberty of a citizen may a court conclude that a seizure has occurred. *United States v. Jordan*, 635 F.3d 1181, 1185 (11th Cir. 2011).

Here, officers' initial approach to the house in an attempt to make contact with Defendant and interview him concerning the activity agents had witnessed did not implicate the Fourth Amendment consistent with the cases cited above. At that time, Defendant was located outside his home near his truck in a parking area more than 30 feet (estimated) away from his home. *See* Exh. B, p. 1-2 (depicting the location of the white GMC Sierra in aerial still photographs). Upon sight of police, however, Defendant moved away from the vehicle he was standing near and discarded a grocery bag agents believed to contain money or contraband based on their earlier surveillance throughout the day.

Because Defendant abandoned the bag of money, there is no fourth amendment issue at play with regard to it. No seizure of property exists under the Fourth Amendment when a person abandons property. *Hester v. United States,* 265 U.S. 57, 58, 44 S.Ct. 445, 68 L.Ed. 898 (1924). To determine whether an individual has abandoned property, the court looks to whether the individual "voluntarily discarded, left behind, or otherwise *relinquished his interest in the property* in question so that he could no longer retain a reasonable expectation of privacy with regard to it *at the time of the search*." *Ramos,* 12 F.3d at 1022 (internal quotation marks omitted). Abandonment "is a question of intent which may be inferred from acts, words and other objective facts." *Id.* at 1022–23 (internal quotation marks omitted). Defendant's actions – discarding the bag in the road and walking away from

7

it – amount to a relinquishment of his expectation of privacy in it at the time it was seized by law enforcement.

>    ii.    **Defendant was not within the curtilage of his property at the time agents made contact with him.**

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The constitutional protection of people in their houses extends to the "curtilage" of the home, which is "the area 'immediately surrounding and associated with the home.'" *Collins v. Virginia*, 138 S. Ct. 1663, 1670, (2018) (quoting *Florida v. Jardines*, 569 U.S. 1, 6, (2013)). Subject to a few exceptions, the Fourth Amendment prohibits law enforcement from entering a home or its curtilage to conduct a search without a warrant. *United States v. Walker*, 799 F.3d 1361, 1363 (11th Cir. 2015).

The curtilage may include the portion of a driveway that is "adjacent to the home and 'to which the activity of home life extends.'" *Collins*, 138 S. Ct. at 1671 (citation omitted). In *Collins*, for example, the Supreme Court concluded that an area at the top of a driveway adjacent to the home was curtilage where the area was located behind the front perimeter of the house, was enclosed on two sides by a brick wall and on the third side by the house, had direct access to the house itself through a door in the side of the house that formed part of the enclosure, and was not part of the path that a visitor would take from the street to the front door of the house. *Id.* at 1670–71. "So long as it is curtilage, a parking patio or carport into which an officer can see from the street is no less entitled to protection from trespass and a warrantless search than a fully enclosed garage." *Id.* at 1675.

Questions about whether an area is curtilage "should be resolved with particular reference to four factors: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *United States v. Dunn,* 480 U.S. 294, 301, (1987). The "central component of this inquiry" is "whether the area harbors the 'intimate activity associated with the sanctity of a man's home and the privacies of life' "; in other words, "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.* at 300, 301, (citation omitted).

Defendant makes no argument in his brief that the area of the yard where police initially contacted him near a parking pad was within the curtilage of his home. Rather, he simply refers to the location as within the "property" or "premises."  As such, the Government believes Defendant has abandoned this argument before the court.  Additionally, the Government asserts that Defendant could not establish this area is within the curtilage at any rate, and therefore, it is not subject to protections afforded by the Fourth Amendment's requirements.

The portion of the driveway where Defendant was detained and from which his abandoned bag was seized was not part of the home's curtilage. Based on aerial photographs and photographs of the area attached this response, this is made quite clear. Exh. B, p. 1-4. Defendant's property is a one-story single-family home. The white GMC Sierra Defendant was standing next to when police attempted to make

contact with him was parked in an area of the yard some 20-30 feet from the front of the house on the side of the front yard adjacent to a roundabout driveway in front of the house. It is clear from the photos that the vehicle is not parked in close proximity to the home, and the first *Dunn* factor therefore does not support that area of the yard is within the home's curtilage.

The remaining factors also weigh against Defendant. The driveway here is not gated, covered, enclosed, or partly enclosed; and no effort appears to have been made to conceal if from passersby.  No portion of the driveway or parking area is located behind the front perimeter of the house.  Likewise, it does not appear that any portion of the driveway was used as a porch or patio or otherwise served as an extension of Defendant's home. Furthermore, the parking area would be easily viewed by the path that visitors would naturally take to walk to the front door. Nothing here indicates that the agents entered an area harboring the "intimate activity associated with the sanctity of a man's home and the privacies of life" when they approached Defendant outside his home as he stood near the parking area adjacent to the driveway.

Because the agents did not enter the curtilage of Defendant's home when they confronted him in his driveway, they did not need a warrant to approach and speak to him. *See, e.g.*, *United States v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011). Additionally, Agents had reasonable suspicion and probable cause to believe Defendant was committing criminal activity justifying their initial detention of Defendant while they asked about their observations throughout their investigation and the bag he threw down.  Defendant's nervous, evasive behavior in abruptly

beginning to walk away and dropping the bag as he saw agents approaching was an additional factor making the deputies' suspicion of Defendant objectively reasonable. *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000).

Given all the information know to them, agents had a "reasonable belief" that Defendant "had committed or was committing a crime," establishing probable cause to arrest him. *United States v. Mancilla-Ibarra*, 947 F.3d 1343, 1349 (11th Cir. 2020) (citation omitted).

> ### iii. Officers had reasonable suspicion, as well as probable cause, to believe that a controlled substance offense was being committed at the time they made contact with Defendant and detained him.

Contrary to Defendant's arguments in his brief, regardless of whether or not Defendant was within the curtilage, agents had observed ample conduct which establishing both reasonable articulable suspicion and probable cause related to Defendant prior to police entry onto his property.  Furthermore, their observations of Defendant as they entered only bolstered these observations and provided justification for his detention and provided exigent circumstances for a warrantless entry and detention of Defendant.

The Supreme Court  has defined reasonable suspicion as  "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant (an) intrusion." *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). "[T]o determine whether a suspicion [is] reasonable, the Eleventh Circuit looks to "the *collective knowledge* of all officers involved." *United*

*States v. Bishop*, 940 F.3d 1242, 1249 (1g1th Cir. 2019) (emphasis added).  Under the Supreme Court's decision in *Terry*, law enforcement officers may seize a suspect for a brief investigatory stop when the officers have a reasonable suspicion that the suspect was involved in, or about to be involved in, criminal activity, even though probable cause is lacking. *United States v. Lewis*, 674 F.3d 1298, 1303 (11th Cir. 2012).

The Supreme Court has said that whether there is reasonable suspicion justifying a stop must focus on the totality of the circumstances, including both innocent and apparently suspicious circumstances. *See United States v. Arvizu*, 534 U.S. 266 (2002). Following *Arvizu*, the Eleventh Circuit has emphasized that the court must consider all these factors together, not simply "divide and conquer" by deciding that one or more observations are susceptible to an innocent explanation. *See United States v. Bautista-Silva*, 567 F.3d 1266 (11th Cir. 2009).  Reasonable suspicion may be formed by observation of exclusively legal activity, including unprovoked flight, and such observations may be the basis for a brief, investigatory stop under the Fourth Amendment. *See Illinois v. Wardlow*, 528 U.S. 119.

Probable cause, on the other hand, exists when the facts and circumstances show that the suspect has committed, is committing, or is about to commit an offense. *United States v. Hamilton,* 299 Fed. Appx. 878, 882 (11th Cir 2008) The "collective knowledge" approach applies to probable cause as well. *See United States v. Blasco*, 702 F.2d 1315, 1324 (11th Cir. 2019) ("probable cause. . . exists where the facts and circumstances within the collective knowledge of the law enforcement officials, of

which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that an offense has been or is being committed.")

Under the totality of the circumstances, as shown in the factual basis above, CNT agents had ample evidence of criminal activity at the time they entered Defendant's property.  Leading up to their contact with Defendant, agents had already intercepted numerous wire communications concerning a large narcotics shipment being organized by the DTO and had also conducted surveillance on numerous meetings between identified coconspirators which included exchanges consistent with the wire intercepts.  On at least two occasions, Defendant himself was observed meeting with coconspirators wherein exchanges took place – the final of which occurred at his residence mere moments before police encountered him. At the same time, agents also determined neither Orr nor Brown were in possession of the black bag which appeared to have been provided to given to Defendant based on aerial surveillance.  Taken together, it must be said that agents had "reasonable suspicion that the suspect was involved in, or about to be involved in, criminal activity."  Moreover, agents had probable cause – reasonably trustworthy information, sufficient to cause a person of reasonable caution to believe that an offense has been or is being committed – to arrest Defendant for controlled substance violations and to seize the bag abandoned by him on sight of police.

At the point that police observed Defendant abandon the bag and begin to walk away from them, they also had exigent circumstances justifying his detention to prevent any potential loss or destruction of evidence that might be inside the

home if Defendant were left there while agents were seeking a search warrant. The "exigent circumstances" exception to the warrant requirement "encompasses several common situations where resort to a magistrate for a search warrant is not feasible or advisable, including: danger of flight or escape, loss or destruction of evidence, risk of harm to the public or the police, mobility of a vehicle, and hot pursuit." *United States v. Holloway*, 290 F.3d 1331, 1334–35 (11th Cir. 2002) (collecting cases). The Eleventh Circuit has stated that the need to invoke the exigent circumstances exception to the warrant requirement is "particularly compelling in narcotics cases" because narcotics can be so quickly destroyed. *United States v. Young,* 909 F.2d 442, 446 (11th Cir.1990). The test of whether exigent circumstances exist is an objective one. *United States v. Tobin*, 923 F.2d 1506, 1510 (11th Cir. 1991). "'[T]he appropriate inquiry is whether the facts ... would lead a reasonable, experienced agent to believe that evidence might be destroyed before a warrant could be secured.' " *Id.* (quoting *United States v. Rivera,* 825 F.2d 152, 156 (7th Cir.), *cert. denied,* 484 U.S. 979, 108 S.Ct. 494, 98 L.Ed.2d 492 (1987)).

Here, a reasonable, experienced agent would believe that evidence might be destroyed before a warrant could be secured, especially in light of Defendant's actions upon sight of police. In addition, there was risk that Defendant might alert other coconspirators to the presence of the ongoing police operation. As such, exigent circumstances justified Defendant's detention, and along with the probable cause police already possessed for his arrest, justified entry onto his property even if that entry had included the curtilage of the home.

14

**B. The Search Warrant for 5611 LaRoche Avenue, Savannah, GA contains sufficient probable cause and therefore is valid.**

"The right of the people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation . . . ." U.S. Const. amend. IV. To establish probable cause there need only be "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). Probable cause is a "fluid concept . . . not readily, or even usefully, reduced to a neat set of legal rules." Id. at 231. Rather, determining the existence of probable cause requires "the assessment of probabilities in particular factual contexts." Id. A law enforcement officer's opinion—formed by his experience, training, and knowledge—is properly considered when assessing probable cause. United States v. Robinson, 62 F.3d 1325, 1331 n.9 (11th Cir. 1995) (quoting United States v. Motz, 936 F.2d 1021, 1024 (9th Cir. 1991)).

Probable cause to search a residence requires law enforcement to establish "some nexus between the premises and the alleged crime." United States v. Joseph, 709 F.3d 1085, 1100 (11th Cir. 2013) (quoting United States v. Bradley, 644 F.3d 1213, 1263 (11th Cir. 2011)). An officer's opinion, based on his experience, training, and knowledge, that evidence of an alleged crime "is likely to be found in a suspect's residence satisfies probable cause." Bradley, 644 F.3d at 1263-64. The affiant "need not allege illegal activity occurred at the home, but should establish a connection

between the defendant and the residence to be searched and a link between the residence and any criminal activity." United States v. Lebowitz, 676 F.3d 1000, 1011 (11th Cir. 2012) (quoting United States v. Martin, 297 F.3d 1308, 1312 (11th Cir. 2002)). The Eleventh Circuit Court of Appeals has noted that:

> [t]he justification for allowing a search of a person's residence when that person is suspected of criminal activity is the common-sense realization that one tends to conceal fruits and instrumentalities of a crime in a place to which easy access may be had and in which privacy is nevertheless maintained. In normal situations, few places are more convenient than one's residence for use in planning and hiding fruits of a crime.

United States v. Kapordelis, 569 F.3d 1291, 1310 (11th Cir. 2009).

In this case, the affidavit contained sufficient probable cause establishing a connection between the residence and evidence of the alleged crime. (The Affidavit in support of the search of 5611 LaRoche, Savannah, Georgia is attached hereto as Exhibit C). The affidavit contains detailed information provided by CRI 14-95 which was corroborated by law enforcement along with details of the agents' independent investigation. Exh. C, p. 3-6. Furthermore, agents were aware that CR 14-95 was actually a series of Title III wiretaps the court authorized during this investigation.

If an informant is mentioned in the affidavit, the affidavit must also demonstrate the informant's "veracity" and "basis of knowledge." (*Martin,* 297 F.3d 1308, 1314. Citing *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).) In the case at hand, the affidavit details that "CRI 14-95 is not a convicted felon, is not on probation or parole, has no pending charges, and is receiving monetary compensation. CRI 14-95 has provided information in over seven investigations, leading to over a dozen felony arrests and convictions, of securing several search

warrants, seizures of over a kilogram of cocaine, multiple pounds of marijuana, over an ounce of heroin, and numerous firearms.  Additionally, your Affiant has provided instances herein where the information and intelligence being provided by CRI 14-95 has been independently validated through alternative means and sources." Exh. A, p. 4. Accordingly, the magistrate was made aware that Agent Boger believed CRI 14-95 to have provided credible information on which the magistrate could rely.

Furthermore, "[w]hen there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant." (*Id at 1314.* Citing *United States v. Danhauer,* 229 F.3d 1002, 1006 (10th Cir.2000).) Defendant does not challenge either the veracity of CRI 14-95 or the corroboration provided by agents in support of probable cause, but the Government provides the above information establishing law enforcements belief in CRI 14-95's veracity as it is relevant to the determination of probable cause as set forth in the four corners of the affidavit.

In the affidavit, Agent Boger provided a detailed description of events relating drug trafficking activity conducted by the DTO under investigation which took place on June 10, 2020.  The affidavit begins with the description of a significant resupply of cocaine arranged by codefendants Brown, Orr, and other members of the DTO. Utilizing CRI 14-95 on June 8, 2020, Agents learned that Brown, Orr, and others made arrangements with a narcotics courier for a large resupply of cocaine. Exh. C, p. 3. It was also learned that the narcotics resupply was to be transported by vehicle

17

into Chatham County on June 10, 2020, where the courier would meet with Brown and Orr.  Id.

Consistent with what agents had learned from CRI 14-95, on June 10, 2020 at approximately 11:00 am, agents observed Brown as he traveled North on I-95 to his residence at 1927 Quincy Street, Savannah, Georgia. Exh. C, p. 4.  Agents also began surveillance on Orr that morning, and observed Orr arrive at Brown's residence around 2:00 pm.   At approximately 2:30 pm, a white Chevy Tahoe driven by Defendant arrived at the residence. Id. Utilizing CRI 14-95, agents learned at approximately 3:15 pm that the men were in communication with the narcotics courier and still intended to meet with him around 5:00 pm.  These communications were occurring over several phones utilized by members of the conspiracy to facilitate drug transactions.  Agent Boger reports in the affidavit that he personally verified these phone numbers.  Id.

At approximately 4:08 pm, Smith left Brown's residence.  Another conspirator, Graham, then arrived at the residence and appeared to be waiting outside in his vehicle.  At approximately 4:30 pm, another individual driving a Nissan Altima, Badger, arrived at the location and parked alongside Graham.  Graham then exited his vehicle and leaned into the Altima where agents observed an interaction.  Brown then exited his residence, leaned into the Altima momentarily, and then walked away with Graham toward his residence. Id.

A few moments later, agents observed codefendant Cleveland arrived and met with Brown at the residence.  As they met, Cleveland was observed retrieving a large

book-bag from the front passenger compartment of his vehicle before entering Brown's residence.  Shortly thereafter, Cleveland exited without the bag and left the area. At around 4:59 pm, agents utilized CRI 14-95 to learn that Graham was meeting with the source of supply to inspect the quality of the cocaine.  Ten minutes later, at 5:10 pm, CRI 14-95 provided that Graham had arrived at Brown's residence.  Agents observed Brown approach Graham's vehicle and lean in briefly.  Thereafter, Graham left the area.  Brown then also left in a black Chevy Tahoe. Id.

At 5:45 pm, agents observed Brown's Tahoe backed up to another vehicle[1] with trunks open near 5611 LaRoche Avenue, Savannah, Georgia.  Shortly after, the vehicle traveled toward DeRenne Avenue.  Agents then made contact with an individual[2] at 5611 LaRoche Avenue and recovered a large sum of money in a bag. Around the same time, at 6:01 pm, agents utilizing CRI 14-95 determined Graham believed he had obtained good quality cocaine.  Id.  They were also able to conduct open air sniffs of two vehicles, Badger's Nissan Altima, and the GMC Sierra.  Exh. C, p. 5.

Based on the foregoing, Agent Boger then summarized his opinions regarding probable cause:

> Your Affiant noted that various members of the narcotics conspiracy arrived and appeared to meet with Brown at 1927 Quincy Street; prior to the scheduled meet time identified by CRI 14-95, when Brown and Orr were expected to meet with the suspected narcotics courier and conduct the narcotics deal. Furthermore, Your Affiant has illustrated that Brown left the 1927 Quincy Street address, after which he was observed making an apparent transaction with another individual at the 5611 LaRoche Avenue address, which when coupled with the recovery of the large sum of U.S. Currency, and the K9's

---

[1] Defendant's white GMC Sierra.

[2] Defendant.

positive alert indicates to Your Affiant that the target address is directly involved in the distribution of controlled substances. In Your Affiant's training and experience in the investigation of narcotics traffickers, the above observed events involving the known and identified members of the DTO, are consistent with what is known to be narcotics related transactions. Specifically, Your Affiant believes that members of the narcotics conspiracy were likely meeting with Brown as it related to the impending narcotics supply involving the suspected courier identified by CRI 14-95; which could involve the exchange of funds for anticipated narcotics supplies. Exh C, p. 5.

Agent Boger also described his experience related to narcotics traffickers use of cellphones, retention of drug related items including packaging material, scales, ledgers, and the like; and possession of firearms.  Exh C, p. 5-6.

Throughout the search warrant affidavit, Agent Boger provided detailed information learned from CRI 14-95 during the course of this investigation. That information was corroborated by agents via some form of surveillance whether physical or electronic, as detailed more specifically above. Agent Boger then avers in the warrant that in his knowledge, training and experience, drug traffickers often keep drugs and drug related items in their homes, including firearms. When the facts of the affidavit are read and compared to the law as noted above, specifically United States v. Kapordelis, 569 F.3d 1291, 1310 (11th Cir. 2009), it is clear that the affidavit provided sufficient legal probable cause for the issuance of the search warrant for 5611 LaRoche Avenue, Savannah, GA.

> i.    **Even If Actual Probable Cause Did Not Exist, The Affidavit Had Indicia Of Probable Cause Sufficient To Justify A Reasonable Belief In The Validity Of The Search Warrant.**

The good faith exception to the Fourth Amendment's exclusionary rule "stands for the principle that courts generally should not render inadmissible evidence

obtained by police officers acting in reasonable reliance upon a search warrant that is ultimately found to be unsupported by probable cause." *United States v. Martin,* 297 F.3d 1308, 1313 (11th Cir. 2002), citing *United States v. Leon*, 468 U.S. 897, 922, 104 S.Ct. 3405 (1984). "The purpose of the exclusionary rule is to deter unlawful police misconduct; therefore, when officers engage in 'objectively reasonable law enforcement activity' and have acted in good faith when obtaining a search warrant from a judge or magistrate, the *Leon* good faith exception applies." *Id.* "The *Leon* good faith exception requires suppression 'only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause.'" *Id.* (citation omitted).

Under *Leon,* "searches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." 468 U.S. at 922, 104 S. Ct. at 3420 (quotation and citation omitted). However, "in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." *Id.* at 922-23, 104 S. Ct. at 3420. *Leon's* good faith exception, therefore, does not apply to the following situations: (1) where the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing magistrate wholly abandoned his judicial role; (3) where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely

unreasonable; and (4) where, depending upon the circumstances of the particular case, a warrant is so facially deficient - *i.e.,* in failing to particularize the place to be searched or the things to be seized - that the executing officers cannot reasonably presume it to be valid. *Martin,* 297 F.3d at 1313.

Defendant makes no assertion in his brief that the magistrate judge was mislead by information known by the affiant to be false or used in reckless disregard for the truth, that the magistrate wholly abandoned his judicial role, that the warrant was so lacking in probable cause that reliance on it was unreasonable, or that the warrant is deficient on its face.  In fact, Defendant does not argue anywhere in his brief that the good faith exception should not apply.  As such, the government believes that, even if the court determined that probable cause was lacking in this case, the evidence should be admissible under *Leon.*

Regardless, even if actual probable cause did not exist, the affidavit had indicia of probable cause sufficient to justify a reasonable belief in the validity of the search warrant. The Government has detailed at length above the information provided by CRI 14-95 along with corroboration and independent investigation conducted by agents.  Therefore, the Government will not belabor all the same arguments here. The Government maintains that when the facts are read together it is clear that the affidavit provided sufficient legal probable cause for the issuance of the search warrant for 5611 LaRoche Avenue, Savannah, GA.

However, even if the affidavit suffered from deficiencies, it was not entirely unreasonable for the officers to believe that the information therein supported a

finding of probable cause. "[T]he affidavit should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity." (*Martin* at 1314. *See also Gates,* 462 U.S. at 234-36, 103 S. Ct. at 2330-31 (recognizing affidavits "are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleading have no proper place in this area.").

The specific facts in the affidavit tied the Defendant to the target location and subject vehicle. Furthermore, CRI 14-95, which agents knew to be the wires, provided detailed and credible information regarding repeated and specific drug distribution activity during this investigation. Based on that information as well as agents independent investigation, a reasonable officer would believe the affidavit established a fair probability that evidence of the crime would be found in the place to be searched.

### C. The Search Warrant was not overly-broad and non-particularized

The warrant must "particularly describe[e] the place to be searched, and the persons or things to be seized." *U.S. Const.* amend. IV. "A description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized." *United States v. Wuagneux*, 683 F.2d 1343, 1348 (11th Cir. 1982) (citing *United States v. Cook*, 657 F.2d 730, 733 (5th Cir. 1981)). In addition, "a description is valid if it is as specific as the circumstances and the nature of the activity under investigation permit." *United States v. Blum*, 753 F.2d 999, 1001 (11th Cir. 1985) (citing *Wuagneux*, 683 F.3d at 1349).

As it relates to general warrants, the United States Supreme Court has made it clear that, "General warrants of course, are prohibited by the Fourth Amendment." *Andresen v. Maryland*, 427 U.S. 463, 480, 96 S. Ct. 2737, 2748, 49 L. Ed. 2d 627 (1976).  The Court goes on to say, "[t]his requirement 'makes general searches . . . impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.' *Stanford v. Texas*, 379 U.S. 476, 485, 85 S.Ct. 506, 512, 13 L.Ed.2d 431 (1965), quoting *Marron v. United States*, 275 U.S., at 196, 48 S.Ct. at 76." *Id.*

Contrary to Defendant's argument, the application and warrants describe with sufficient particularity the items to seized.  Defendant claims the warrant "failed to provide any specific guidelines for identifying and separating items to be sought from those outside the scope of the warrant, [and] the warrants encouraged wholesale seizure of items." Doc. 341, p. 5.  However, the search warrant set out twelve (12) specifically enumerated items (Exh. C, p. 10-11) described in such a particular way to "enable[] the searcher to reasonably ascertain and identify the things authorized to be seized." *Wuagneux*, 683 F.2d at 1348.  The search warrant at issue here is hardly "the 'general warrant' abhorred by the colonists, and the problem is not that of intrusion per se, but of a general, exploratory rummaging in a person's belongings. *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S. Ct. 2022, 2038, 29 L. Ed. 2d 564 (1971), holding modified by *Horton v. California*, 496 U.S. 128, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990).

For these reasons, the Government contends that Defendant's motion should be denied because his argument concerning particularity is an insufficient basis for suppression.

### D. Defendant's statement was knowing and voluntary

Prior to Defendant's statement to police, he was advised of his rights by Agent Minton.  As such, his statement was knowingly and voluntarily made pursuant to *Miranda* and its progeny.  In addition, the Government will present Agent Minton for testimony before the court at a *Jackson v. Denno* hearing whenever such is scheduled.

*Continues on the following page*

## CONCLUSION

For the foregoing reasons, the Government moves this Court to deny Defendant's motion to suppress the search warrant and other evidence (Doc. 341).

This 1st day of April 2022.

Sincerely,

DAVID H. ESTES
UNITED STATES ATTORNEY

*/s/Frank M. Pennington, II*
Frank M. Pennington, II
Assistant United States Attorney
Georgia Bar Number 141419

22 Barnard Street, Ste. 300
Savannah, GA, 31410
912-652-4422

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
### SAVANNAH DIVISION

| | | |
|---|---|---|
| **UNITD STATES OF AMERICA** | **)** | |
| | **)** | |
| | **)** | **CASE NO. 4:21-CR-111** |
| **v.** | **)** | |
| | **)** | |
| | **)** | |
| **RAPHAEL SMITH** | **)** | |

## CERTIFICATE OF SERVICE OF GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT RAPHAEL SMITH'S MOTION TO SUPPRESS SEARCH WARRANT AND OTHER EVIDENCE (Doc. 341)

The undersigned AUSA certifies that a copy of this response has been filed electronically on the ECF system and therefore served on the Defendant.

This 1st day of April 2022.

Sincerely,

DAVID H. ESTES
UNITED STATES ATTORNEY

*/s/ Frank M. Pennington, II*
Frank M. Pennington, II
Assistant United States Attorney
Georgia Bar Number 141419

22 Barnard Street, Ste. 300
Savannah, GA, 31410
912-652-4422